## UNITED STATES v. DAUBNER.

*(District Court, E. D. Wisconsin. May 21, 1883.)*

1. MAKING AND PRESENTING FALSE CLAIM—FALSE AFFIDAVIT TO PROCURE PENSION—REV. ST. §§ 5438, 4746—NOT FELONY—CHALLENGE OF JURORS.

   The offenses described in sections 5438 and 4746 of the Revised Statutes are not felonies, and a party indicted therefor, is not entitled, under section 819 of the Revised Statutes, to challenge more than three jurors.

2. SAME—REV. ST. § 819—WAIVING CHALLENGE—PRACTICE.

   In the trial of such a case the district court is governed by section 819 of the Revised Statutes, and under that section each party will be entitled to three peremptory challenges; and when the calling of a new juror is necessitated by the challenge of either party, the other party has a right of challenge as to such juror, although he may have previously passed the list, provided he has not already exhausted his three peremptory challenges.

3. NEW TRIAL—MISCONDUCT OF JUROR—VERDICT.

   The mere circumstance that a juror in a criminal case rode from the court-house with a witness for the prosecution, and boarded at the same place with such witness during the trial, without some further evidence that the circumstance operated prejudicially to the defendant, is not ground for disturbing the verdict.

4. SAME—SPEAKING OF CASE.

   The fact that two of the jurors spoke of the trial, and the length of time consumed therein, and one of them exhibited a memorandum book in which the names of the witnesses were written, will not be ground for setting aside the verdict when it does not appear that anything as to the merits of the case was discussed in the conversation.

5. IMPEACHING VERDICT—AFFIDAVITS OF JURORS.

   The affidavits of jurors as to what transpired in the jury-room, and their understanding of the verdict they rendered, or were to render, and of the ruling of the court in relation to the evidence of a certain witness, cannot have the effect to impeach the verdict.

6. NEW TRIAL—INSUFFICIENCY OF EVIDENCE.

   While the court should set aside a verdict which is clearly against the evidence, and while greater latitude is allowed in the examinations of motions for a new trial, on the ground of the insufficiency of the evidence, in criminal than in civil cases, it should be well satisfied of the insufficiency of the evidence to convince the judgment, reason, and conscience of the jurors of the correctness of the verdict; and as the circumstances which properly influence the jury are so various, and so often impossible to be known to the court, there should be greater hesitation before the verdict will be disturbed when the evidence is conflicting.

7. SAME—MOTION DENIED.

   As, upon examination of the rulings of the court as to the admission and exclusion of evidence, and the instructions as to the effect thereof, no error appears, and the verdict of guilty on the first and third counts, and acquittal on the second and fourth, are not inconsistent, and the verdict is sufficiently supported by the evidence, the motion for a new trial is denied.

The indictment in this case was based upon sections 5438 and 4746 of the Revised Statutes of the United States. Section 5438 provides that "every person who makes, or causes to be made, or presents, or causes to be presented, for payment or approval to or by any person in the civil * * * service of the United States, any claim upon or against the government of the United States, knowing such claim to be false, fictitious, or fraudulent, or who, for the pur-

pose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false * * * affidavit, knowing the same to contain any fraudulent or fictitious statement, * * * shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars." Section 4746 provides that "every person who knowingly or willfully in anywise procures the making or presentation of any false or fraudulent affidavit concerning any claim for pension or payment thereof, * * * shall be punished by a fine not exceeding five hundred dollars, or by imprisonment for a term not exceeding three years, or by both." The indictment contained four counts. The first two counts alleged offenses under section 5438, and the last two stated offenses under section 4746. * * * The jury found the defendant guilty on the first and third counts, and not guilty on the second and fourth counts. A motion for a new trial was then made and argued.

G. W. Hazelton, for the United States.

Geo. B Goodwin and James G. Jenkins, for defendant.

DYER, J. The motion is based on various grounds.

1. When the jury was impaneled the defendant claimed the right to challenge peremptorily any number of the jurors to the extent of 10, under section 819 of the Revised Statutes. He asserted such right on the ground that the offenses with which he was charged were felonies. The court ruled against him on the point, and allowed him but three peremptory challenges. Section 819 referred to, is as follows:

"When the offense charged is treason, or a capital offense, the defendant shall be entitled to twenty and the United States to five peremptory challenges; on the trial of any other felony, the defendant shall be entitled to ten and the United States to three peremptory challenges; and in all other cases, civil and criminal, each party shall be entitled to three peremptory challenges."

What offenses, under the laws of the United States, constitute felonies, as that term is used in section 819, is, perhaps, a close question. It was contended at the bar, by counsel for the defendant, that whether or not an offense named in the federal statutes is a felony, depends on the character of the punishment affixed to the commission of the offense, and where such punishment is imprisonment at hard labor, the offense is a felony. On the part of the prosecution it was argued that an offense, to be a felony, must be one expressly declared such by statute, or one that at common law would be a felony. I shall not attempt a discussion of the question, since it has been so well considered in the case of U. S. v. Coppersmith, 4 FED. REP. 198. In that case Judge HAMMOND decided that the clause quoted from section 819 may operate in other than capital cases to give a defendant 10 challenges, in the following classes of cases: First, where the offense is declared by statute, expressly or

impliedly, to be a felony; *second,* where congress does not define an offense, but simply punishes it by its common-law name, and at common law it is a felony; *third,* where congress adopts a state law as to an offense, and under such law it is a felony. In this statement of what constitutes a felony under the laws of the United States I concur; and no argument is needed to show that the offenses charged in this indictment do not come under either of the categories named.

In *U. S.* v. *Yates,* 6 FED. REP. 861, it was held that the crime of passing counterfeit trade dollars is not an infamous crime, within the meaning of the fifth amendment of the constitution of the United States, and that such an offense may be prosecuted upon information filed by the district attorney. In his opinion Judge BENEDICT makes an observation applicable to the case at bar. He says:

" By the statutes of many states any crime punishable by hard labor is a felony; but no such test is furnished by the statutes of the United States. Indeed, a provision declaring that ' a felony under any law of the United States is a crime punishable with death, or by imprisonment at hard labor,' and that ' every other crime is a misdemeanor,' submitted by the revisers of the statutes in their draft, was rejected."

If punishment by hard labor were the test of a felony, it might even then be doubted whether the offenses here charged would come within the rule; because section 4746 does not impose as a punishment for its violation imprisonment at hard labor. The punishment under that section may be by a mere fine, or by simple imprisonment, or by both, while the penalty imposed by section 5438 may be a fine or imprisonment at hard labor.

In *U. S.* v. *Baugh,* 1 FED. REP. 784,—a case which, I think, was not referred to on the argument,—it was held that a state statute which declared all offenses to be felonies which are punishable by confinement in the penitentiary, does not apply to criminal cases in the federal courts; that the rules of procedure in those courts in such cases are derived from the common law; and that under the federal laws nothing is felony unless expressly so declared to be by congress, with the exception of capital offenses. Judge HUGHES further observes that it has always been the policy of congress to avoid, as much as possible, the multiplication of statutory felonies; citing 1 Greenl. Ev. § 373, and 1 Whart. Crim. Law, § 760.

It was said on the argument, by one of the counsel for the defendant, that because the indictment charges that Daubner feloniously made, or caused to be made, presented, or caused to be presented, a false and fraudulent claim for a pension, and false and fraudulent affidavits in support thereof, the offenses charged should be treated as felonies. But to predicate of an act that it is felonious, is simply to assert a legal conclusion as to the quality of the act; and unless the act charged of itself imports a felony, it is not made so by the application of this epithet. This was distinctly held in *Matthews* v. *State,* 4 Ohio St. 539, 542. Touching the point under considera-

tion, the conclusion of the court is that the offenses here charged are not felonies, and therefore that the defendant was entitled to only three challenges.

2. When a jury was called to try the case, the list was passed alternately to the district attorney and to counsel for the defendant, according to the usual practice. The attorney for the government exercised his right of peremptory challenge once, and counsel on the part of the defendant then exercised their right of peremptory challenge three times. Up to the time that the last challenge was made on the part of the defendant, the district attorney had twice passed the list of jurors without striking any names therefrom; but when the last juror was called, after the defendant had exercised his right to challenge the third time, and upon the list being passed to the district attorney, he struck from the list the name of such juror, and another was called in his place. This was objected to at the time by the defendant's counsel, but the court held that the prosecutor had the right of peremptory challenge when he so struck the name of such juror from the list, although he had previously passed the list before that juror was called. The defendant, although he had already exercised his right of peremptory challenge three times, thereupon asked leave generally to strike the name of another juror from the list. This application was denied. He then asked permission to strike from the list the name of one of the jurors called since he had made his third peremptory challenge, and this request was refused by the court, for the reason that the defendant had exercised the right of peremptory challenge three times, and had, therefore, exhausted his right of challenge.

Although the method thus pursued in organizing the jury was, as the court understands it, in accordance with the practice as it has always prevailed in this court, it is contended that it was error to permit the district attorney to peremptorily challenge a juror after he had challenged once, and twice passed the list without challenge. It will not be overlooked that the defendant was given and had three peremptory challenges, and that the district attorney struck but two names from the list. Before his last challenge he had twice passed the list without challenge,—that is, he declared himself content with the jury *as it then stood;* but after that the defendant's counsel exercised his right a third time, which necessitated the calling of a new juror, and it seemed to the court that the prosecutor's right to peremptorily challenge that juror was undoubted, because each party under the law was entitled to three peremptory challenges.

It is claimed, however, that when the district attorney twice passed the list he twice waived the right of challenge, and that by each such waiver he lost a right of challenge; and the provisions of section 2851 of the Revised Statutes of Wisconsin have been called to the notice of the court. That section provides that "each party shall be entitled to three peremptory challenges from a full panel of jurors

called in the action. The challenges shall be made alternately by the parties, one at a time, the plaintiff beginning, and when either party shall decline to challenge in his turn he shall be deemed to have waived each time one challenge." If this statute were applicable here, the objection made to the course of procedure in organizing the jury would seem to be well taken; but clearly this court must be controlled by section 819 of the Revised Statutes of the United States, and that section declares absolutely that each party in such a case as this shall be entitled to three peremptory challenges, and when the calling of a new juror was necessitated by the challenge of either party, I think the other had a right of challenge as to such juror, although he may have previously passed the list, provided he had not already exhausted his three peremptory challenges. It is argued that by the course pursued the district attorney in effect was enabled to exercise his right as to 13 jurors, while the defendant was limited in the exercise of his right to 12; but the calling of the thirteenth juror was made necessary by the defendant's last and third peremptory challenge, and the court cannot perceive any good reason for denying to the prosecutor the right to challenge that juror, although he had declared himself content with the jury as it previously stood, when the fact was that he had exercised his right of peremptory challenge but once before the thirteenth juror was called. In other words, I do not think, under the practice in this court and the statutes of the United States, the prosecutor waived his right to make the peremptory challenge objected to by previously passing the list as he did without challenge.

3. It is further urged that the findings of the jury are inconsistent, in that they find the defendant guilty on the first and third counts of the indictment, and not guilty on the second and fourth counts, and therefore that the verdict cannot stand. It seemed to the court, on the argument, that there was much force in the point made by the district attorney, that the first and third counts are sufficient in law to warrant a verdict; and that a verdict of not guilty on the second and fourth counts cannot, in any event, vitiate a verdict of guilty on the first and third. But an analysis of the counts, I think, shows that the findings of the jury upon the different counts are not so inconsistent as to affect their verdict. While the second count does, in its preliminary statements, refer to the defendant's claim for a pension, and characterizes it as false and fraudulent, it is evident that the count is really based upon Daubner's affidavit of April 21, 1879, and that that affidavit constitutes the gist of the count; and, upon careful examination of the affidavit, and its particular subject-matter, I think a finding that its statements are true is not necessarily inconsistent with a finding that certain material statements contained in the declaration for a pension, set forth in the first count, and in the affidavit set forth in the third count, are not true. The same may be said of the affidavit of Cunderman, which forms the

basis of the fourth count; and this was the view of the court when it submitted the case to the jury, and instructed them with reference to their right to find upon the different counts. The affidavit of Daubner set forth in the second count relates entirely to his condition of health before enlisting in the service; to his health and the medical treatment he received after his discharge; to his occupation, and physical ability to perform labor and engage in business; while the affidavit of Cunderman merely states that he never heard of Daubner being sick until he went into the army; that he took care of Daubner in some of his sickness in the service, without stating what the sickness was; that since his discharge Daubner has labored under a disease which he claims to be catalepsy, contracted in the service; and that he is so afflicted, and is unable to follow his business, and has been so since his discharge. All this may have been true, and yet certain vital statements of fact in the declaration for a pension, and in other affidavits set out in the third count, may have been false. I conclude, therefore, that the objection of inconsistency made against the verdict is untenable.

4. In connection with the declaration for a pension, and the affidavits set out in the different counts of the indictment, the prosecution offered in evidence the discharge of the defendant from military service granted to him April 8, 1863, and the surgeon's certificate of disability upon which it was claimed the discharge was granted. No objection was made on the part of the defendant to the introduction of the discharge in evidence; but when the surgeon's certificate of disability was offered, it was objected to, and the court overruled the objection. This ruling is assigned as error on the present motion. The discharge recites, among other things, "that George H. Daubner, a private of Capt. John A. Williams' Company A, twenty-eighth regiment of Wisconsin volunteer infantry, who was enrolled on the twenty-first day of August, 1862, to serve three years, is hereby discharged from the service of the United States, this eighth day of April, 1863, at Helena, Arkansas, by reason of disability, as per surgeon's certificate," and purports to have been signed by H. M. Lyons, post surgeon. The certificate of disability is in the prescribed form, and the post surgeon, H. M. Lyons, therein certified that he had carefully examined the said George H. Daubner, of Capt. Williams' company, and found him incapable of performing the duties of a soldier, because of chronic inflammation of the left hand, causing the *anchylosis* of the joints of the first and second fingers in such a position as to render the organ useless, together with a cataract of the right eye, and that in the opinion of the surgeon Daubner could not be rendered fit for service by any treatment. This certificate bears the same date as that of the discharge, namely, April 8, 1863, and was admitted in evidence by the court on the ground that it was part of the record or history of Daubner's connection with the service; that it was essentially part of the discharge from service. But when it was admitted, the

court ruled that the defendant was not bound or affected by statements in the certificate, of the character of his disability, by the surgeon, without proof connecting him with the making or execution of the certificate.

In its instructions to the jury the court said:

" There has been put in evidence the discharge of the defendant from the service, and in connection therewith the surgeon's certificate of disability, and there has been some discussion concerning the competency and effect of this certificate as a piece of evidence in the case. You may take that certificate into consideration as showing that the defendant was not discharged for catalepsy, but that he was discharged on the alleged grounds therein stated. It does not prove that the defendant did not have catalepsy. It is only evidence to the extent indicated, and will only be considered to that extent by you."

Upon mature consideration the court is satisfied that its ruling upon the admission of the surgeon's certificate in connection with the discharge, and its instruction to the jury in relation thereto, were right. The discharge and the certificate bear the same date. They were executed at Helena, Arkansas, by the same person. The discharge refers to the surgeon's certificate, and it was evidently intended that in ascertaining the character of the disability which constituted the grounds of the discharge, the certificate should be looked into as containing a statement of such disability. In effect, the surgeon's certificate was made part of the discharge, and the discharge and certificate together constituted the record, forming the basis of the action of the post surgeon in relieving Daubner from the further performance of military duty. The court, in its instructions to the jury, endeavored to state with care the extent to which this certificate was competent as evidence in the case; that is, that it might be taken into consideration as showing that the defendant was not discharged for catalepsy; but that it was not proof that in fact he did not then have catalepsy. It does not seem to the court, after reflection, that this was error; but, on the contrary, that as part of the record of the discharge the certificate was competent proof that Daubner was not discharged for catalepsy. And as it was necessary to show, as a step in the proofs on the part of the government, that the defendant was discharged from the service, it was entirely proper to show the grounds on which he was discharged, when the discharge itself in terms referred to the surgeon's certificate of disability.

5. Mr. Cushman K. Davis was called as witness on the part of the defendant. He testified among other things that he was a member of the twenty-eighth regiment of Wisconsin volunteer infantry, and accompanied the regiment to Helena, Arkansas; that after a certain expedition, known as the Yazoo Pass expedition, he saw the defendant in the post hospital at Helena; that Dr. Lyons was the surgeon in charge; that he, the witness, saw defendant lying on a cot, apparently unconscious; that after some conversation with Surgeon Lyons about the defendant, he interested himself somewhat in

procuring his discharge; that he called upon one Pierce, and urged him to see that Daubner got his discharge; and that he did this because of what he saw of the defendant, and of what Surgeon Lyons had told him. The witness was then asked this question by counsel for the defendant: "At the time you saw the defendant in a fit at the post hospital, what did Dr. Lyons state with respect to the disease, and what did he state with respect to his ability thereafter to continue in the service?" This question was objected to by the district attorney, and the answer of the witness was taken under objection, which was finally sustained by the court. The question was then repeated, and counsel for the defendant said that they offered to show that Dr. Lyons was in attendance upon the defendant as post surgeon at the time of this fit at the hospital, and that, while the defendant was in the fit, he stated to the witness that the defendant was in a cataleptic fit, and that he never would be able to serve efficiently as a soldier, and would always be subject to such fits, and recommended his discharge on that ground, and that ground alone. This proposed testimony was objected to, and was received under the objection, which was ultimately sustained and the testimony excluded. It is now contended, in support of the motion for a new trial, that the court erred in not permitting this testimony of the witness Davis to be considered by the jury. When the testimony by which it was proposed to show a conversation between the witness and the surgeon was offered, the court thought, and is still of the opinion, that it was hearsay, and was incompetent. It was not shown that the alleged statements of the surgeon accompanied or were part of any act of his in connection with the discharge of the defendant from the service. It was not shown that they were contemporaneous with the making of the discharge and the certificate of disability. The conversation which it was proposed to prove was had at a time prior to the discharge. As the testimony of Mr. Davis shows, his talk with Lyons was concerning the future discharge of defendant. To make it competent, in the judgment of the court, it was essential that the statements of Lyons should be shown to have accompanied the act of discharging Daubner from the service, otherwise it was hearsay.

6. Another point urged in support of the motion for a new trial is this: One Coates, who was a member of the same company as that to which the defendant belonged, was a witness for the prosecution, and was examined at length. He testified generally with reference to the defendant's connection with the service, the state of his health while he and his company were in Arkansas, and during the time the regiment was on the White river expedition,—an expedition concerning which much testimony was given on both sides,—and as to the truthfulness of such of the statements in the defendant's declaration for a pension as related to his service and health at the time and place when and where the defendant claims he contracted

catalepsy. In the course of the examination of the witness it was shown that he had interested himself somewhat actively in the original investigation of the case, and, on cross-examination by defendant's counsel, he was asked whether he did not accompany the special pension examiner who had charge of the examination when that officer visited parties whom it was thought might be witnesses, and in reference to an interview with Dr. McMiller concerning the execution and contents of his affidavit, which is set out in the third count of the indictment. Undoubtedly the primary object of this examination was to show the interest and feeling of Coates in the case. In answer to questions put to him on the cross-examination, the witness testified to statements he made to McMiller about the latter's affidavit, and to certain statements McMiller made in reply, touching the same; among other things, that the witness told McMiller he was mistaken in some of his statements in the affidavit. On re-examination, the court permitted the district attorney to inquire further about that conversation with McMiller, and the witness gave further statements of McMiller, made in the conversation, which tended to impeach his affidavit, and to the effect that the affidavit which he, McMiller, signed, contained representations about the defendant which he did not understand were in it when he signed it. Then, on recross-examination, the witness further testified to other statements which he made to McMiller at the time of their interview in relation to the contents of the affidavit. The questions put to the witness by the district attorney, on re-examination, and by which he sought to draw out more fully the conversation between the witness and Mc-Miller in relation to the affidavit, were objected to; and it was very earnestly insisted by counsel for the defendant that what McMiller told Coates in that conversation, in relation to his affidavit, was not evidence which could be received to show the falsity of the affidavit, and should therefore be rejected. The court permitted the evidence to stand as it was given by the witness, and, when the case was submitted to the jury, the point was renewed in the form of a request to instruct the jury, in substance, that the affidavit of McMiller could not be impeached by that evidence; and now, on this motion, it is again urged that the court erred in allowing the evidence to go to the jury.

Although the primary purpose of defendant's counsel in examining Coates with reference to his interview with McMiller was to show that Coates had interested himself in the case, and was, therefore, not an impartial witness, the court was at the time and is still unable to perceive how that circumstance could deprive the district attorney of the right on re-examination to call out the entire conversation between those parties. A part of the conversation having been developed by the cross-examination of defendant's counsel, the prosecution was entitled to the whole of it, and the entire conversation

having been testified to by the witness, the court, in its opinion, could not properly limit the application of the evidence to the single question of Coates' interest in the prosecution of the case, or his credibility; nor declare what weight or effect it should have in the case, It was competent testimony, made so by the fact that the defendant had opened the door for its introduction. The defendant could not, as it seemed to the court, take the position that that testimony, in the circumstances under which it was called out, might be used to affect or impair the credit of the witness, but not in any manner to prejudice the defendant. Touching this point the court entertains the same opinion now that it did on the trial; and in this connection it may be remarked that much of the testimony offered generally in the case to show the alleged falsity of the defendant's declaration for a pension, bore upon the question of the truthfulness or falsity of the McMiller affidavit.

7. Various affidavits have been submitted to the court in support of the claim that there was misconduct on the part of some of the jurors as another ground of the present motion. Two of the jurors have made affidavits to the effect that while the jury were deliberating on the case their foreman told them, in the presence of the jury, that he knew two of the witnesses for the prosecution, namely, Coates and Carlson, and knew them to be men of honor and truth, and that their statements as witnesses could be relied on. One of them also states in his affidavit that the foreman told the jury in effect that one of the counsel for the defendant had taken special pains to discredit Coates and Carlson in his cross-examination of them, and in his comments upon their testimony; also that it was understood in the jury-room that the court had by its instructions taken all of the testimony of the defendant's witness C. K. Davis out of the case; and, further, that it was understood by jurors that if Daubner did not have a fit on the White river then he must be guilty. The other juror referred to, states further, in his affidavit, that he intended to return a verdict of not guilty on the charge in the indictment in relation to the affidavit of Arthur Holbrook, and that he understood that the jury intended to acquit the defendant upon that charge. Still another of the jurors makes an affidavit that it was his understanding that the defendant was acquitted of the charge against him so far as it related to the Holbrook affidavit; also that he supposed and understood that the greater part of the testimony of C. K. Davis was "thrown out" by the court, and was not to be considered by the jury; and that that part of the witness Davis' testimony wherein he testified in substance that he saw the defendant in a fit at the post hospital in Helena, Arkansas, was discarded by the court, and was not, therefore, to be considered by the jury. The affidavit of one Schmidt is also submitted, in which he states that, while the trial of this case was in progress, he met at the hotel two gentlemen, who informed him in conversation that they were jurors in the Daubner case; that

the deponent remarked to them that the trial was lasting a long time; and that thereupon one of these persons took from his pocket a small pass-book and opened it, and exhibited written therein the names of some or all the witnesses that had been sworn in the course of the trial; "that deponent noticed that there were notes or writing of some kind in said pass-book, in connection with the names of witnesses therein, but what said writing was, or what said notes were, deponent does not know;" that directly afterwards the two jurors sat down together, and, with the pass-book still open before them, began to converse together, as the deponent believes, about matters connected with the trial, but about what particular matters he did not know. The defendant has made an affidavit in which he states that during the trial he twice saw one of the jurymen get into a buggy with one Carlson, who was a witness on the part of the government, and saw him ride away from the court-house building with Carlson. He further states that he is informed and believes that this juror and Carlson boarded at the same place in the city of Milwaukee during the trial.

It seems very clear to the court that nothing contained in these affidavits, which the court can rightfully consider, furnishes any ground for setting aside the verdict. Surely, the mere circumstance that one of the jurors rode from the court-house in a carriage with a witness for the prosecution, and that they boarded at the same place, is wholly insufficient as a ground for disturbing the verdict, without some further evidence that the circumstance operated prejudicially to the defendant. As to the affidavit of Schmidt, it is not shown that the two jurors mentioned therein had any conversation with him about the merits of the case, nor does it show that the notes or writing in the pass-book of one of the jurors related to the case. Indeed, Schmidt says that he does not know what the writing was; nor does he know what the conversation between the two jurors was about, after they left him in the manner stated in the affidavit.

Within the settled rules of law on the subject, the affidavits of the three jurors who testified to what transpired in the jury-room, and to their understanding of the verdict they rendered, or were to render, and of the ruling of the court in relation to the evidence of the witness Davis, cannot have the effect to impeach the verdict. In relation to the testimony of Davis, the court, in its instructions to the jury, distinctly said this:

"In the course of his testimony the witness Davis testified to a conversation he had with the post surgeon at Helena relative to the defendant, and his condition and discharge. This testimony was objected to at the time, but was admitted subject to the objection. The court has since held that testimony incompetent, and now withdraws it from your consideration. You will understand that this ruling applies only to that particular part of the testimony of the witness wherein he stated the conversation with the post surgeon. All the remainder of the testimony of the witness Davis is to be considered by you, as you consider any and all other testimony in the case."

Of the Holbrook affidavit it may be said that it is one of the affidavits set out in the third count of the indictment, the McMiller affidavit being the other. Together they constituted one count. The count is an entirety; and the jury could not render a verdict of guilty as to part of the count, and not guilty as to another part of it. In other words, if they found the charge as to the McMiller affidavit sustained, of necessity their verdict would be guilty on that count, whatever might be their conclusion as to the Holbrook affidavit.

In *Folsom* v. *Manchester*, 11 Cush. 334, it was held, on a review of the authorities, that jurors cannot be allowed to testify what one of their number stated to his fellows, after they had retired for deliberation, concerning the character of the parties to the suit.

In Hil. New Trials, 240, the law is thus stated:

"It is now the general rule that the affidavit of a juror will not be received to impeach his verdict, more especially to show what may have transpired among the jury in the jury-room while considering the case and agreeing upon their verdict. Such affidavit has been called 'an after-thought of the jurors,' and the rule is justified upon the ground that it might sometime happen that a juryman, being a friend to one of the parties, and not being able to bring over his companions to his opinion, might propose a decision by lot, with a view afterwards to set aside the verdict by his own affidavit, if the decision should be against him. So, also, it is said, one might testify one way; another, differently. This would open a novel and alarming source of litigation, and it would be difficult to say when a suit was terminated. * * * It might be the means, in the hands of a dissatisfied juror, to destroy a verdict at any time, after he had assented to it. * * * So, in a late case, it is remarked: It is a rule founded upon obvious considerations of public policy, and it is important that it should be adhered to, and not broken in upon to afford relief in supposed hard cases.' * * * So, affidavits are not admissible that one or more of the jurors misunderstood the charge. * * * Nor will the affidavit of a juror be received that he misunderstood the evidence, or disregarded the evidence and the charge, even in a capital case."

Many cases are cited in the notes to Mr. Hilliard's chapter on this subject in support of the text. In some of the cases the courts have, perhaps, adopted too strict a rule, and one not entirely supported by other adjudications; but I am clearly of the opinion that the affidavits submitted here contain matters which bring them without doubt within the rule established by authorities not to be questioned. And, on the whole, my conclusion is that the verdict cannot be disturbed for any reasons alleged in support of the charge that there was misconduct on the part of the jury or of individual jurors.

\* \* \* \* \* \* \* \* \*

8. Arthur Holbrook, who was the first lieutenant of the company to which the defendant belonged, and the person who made one of the affidavits set out in the third count of the indictment, was examined as a witness for the government. He identified the affidavit referred to, and stated that he signed it at the instance and request of the defendant; further, that he knew nothing of any sickness of the defendant at St. Charles, in Arkansas, nor of a snow-storm at that place;

that he was not on the White river expedition, but left the regiment before that expedition, and knew nothing that transpired in relation to the defendant, after he left the regiment. He was then asked the following questions, and made the following answers, against the objection of defendant's counsel:

"*Question.* Is the following language in the affidavit [meaning the affidavit of the witness mentioned in the third count of the indictment] true, as applicable to any disease contracted by the defendant on the White river expedition, or afterwards, to-wit: 'That subsequently, and during the month of January, 1863, said Daubner was attacked with a disease, and as he had been theretofore exposed to a severe snow-storm, his sickness was supposed to be the result of the same.' *Answer.* It is not true, as so applicable, so far as I know. *Q.* Was the declaration for a pension shown to you, or known to you, at the time of making the affidavits? *A.* No, sir."

Clearly, the questions thus put to this witness were proper. The declaration for a pension alleged that at St. Charles, Arkansas, in January, 1863, the defendant took a severe cold, from exposure to a snow-storm, and was suddenly attacked with a sickness, which prostrated him, and rendered him senseless, etc., and that he, on that attack, remained in an insensible condition for about eight hours; that he was treated on the hospital boat Imperial, in the White river, and immediately afterwards at the hospital in convalescent camp at Helena. As we have seen, the affidavit of Holbrook stated that he was attacked with a disease in January, 1863, and refers to his exposure to a snow-storm, and to sickness as the result of the same. And it further states that Dr. McMiller was second surgeon of the regiment, and was surgeon in the hospital in which the defendant was placed after his attack of sickness. Now, confessedly, the affidavit of Holbrook was procured in support of the defendant's claim and declaration for a pension, and the indictment charges that the affidavit was false, in that it was calculated and intended by Daubner to support his declaration for a pension touching his exposure at St. Charles, Arkansas, on the occasion of the White river expedition, in January, 1863, whereas, in fact, Holbrook had no knowledge whatever of the White river expedition, and was not with the regiment at the time mentioned in Daubner's declaration for a pension; the contents of said declaration not having been communicated to him, and not being known by him when he made his affidavit. It was not claimed by the attorney for the government that Holbrook intended to make a false affidavit; indeed, it was shown, so far as Holbrook was concerned, that when he made his affidavit he understood that he was referring to a condition of things existing while the regiment was in Kentucky, and before he, Holbrook, had left the regiment. But it was claimed in behalf of the prosecution that the defendant procured Holbrook's affidavit in support of his declaration for a pension, which located the place of his alleged sickness and condition of insensibility at St. Charles, and when the regiment was on the White

river expedition, for the purpose of satisfying the department of the truth of the allegations of his declaration. So it became a material question, under the allegations in the indictment, as the court in its charge subsequently said to the jury, whether the affidavit of Holbrook was to the defendant's knowledge false, as an affidavit intended to support his declaration for a pension; that is, whether the defendant intended to mislead and deceive by the use of an affidavit true on its face, but false when applied to such a state of facts as was alleged in the declaration for a pension. Did the defendant intend to deceive the commissioner of pensions by presenting an affidavit appearing on its face to relate to the same state of facts as that set forth in the declaration, but, in fact, and in the mind of the person who made the affidavit, having reference to another and different state of facts? These being pertinent and substantial points of inquiry, bearing upon the defendant's understanding and intent in the transaction, the questions put to the witness Holbrook, which were objected to, were undoubtedly competent.

9. It was in proof that in 1875, and subsequently, the defendant was treated for catalepsy by Dr. N. A. Gray, and that he continued his treatment until the defendant applied for a pension. The defendant testified that Dr. Gray told him finally that his disorder was incurable. The following questions were then put to the defendant, which were objected to by the district attorney, and the objections were sustained, namely:

"*Question.* What, if anything, did Dr. Gray at that time advise you with reference to your right to have a pension for that disability? *Question.* When were you advised, and when did you first know, that you were entitled to a pension from the government on account of this disease of catalepsy?"

The last question was then repeated, and the defendant offered to show that he first knew his disease was a subject for an application for a pension within a few days of the date of the application, and then first learned the same from his physician, Dr. Gray. The court refused to permit the defendant so to testify. It will be observed that the court allowed the defendant to state everything which the physician said to him in relation to his disorder, and as to its alleged incurableness. Concerning the disorder the physician was of course competent to speak, and any information he gave to the defendant which pertained to the disease itself, it was proper to show, and the court permitted it to be shown. But it will be noticed that, in the additional questions put to the defendant, counsel sought to go further, and to show statements which it was claimed the physician made to the defendant in relation to the latter's right to claim and to obtain a pension. This was outside such statements or communications as could be properly called professional. The law fixed the rights of the defendant with reference to a pension, and the statements of the physician to him on that subject were no more admissible than would be the statements of any other person on that subject,

made under the same circumstances. The fact that the defendant may then have been suffering from catalepsy, did not of itself make him a subject for a pension. His right to a pension depended, among other things, upon whether he contracted the disease while in the military service. The questions objected to did not call for any opinion given by the physician to the defendant, which it was competent for him to give as an opinion within the line of his profession; and I can have no doubt that the questions were objectionable.

\* \* \* \* \* \* \*

10. The court has been very strongly urged to grant a new trial on the ground that the verdict is not warranted by the evidence. Appreciating fully the force of the argument made by counsel to the court, on the merits of the case, I have endeavored with the utmost care, and not without anxiety,—*First*, to ascertain within what limits the court may act in exercising the power of granting or refusing a new trial in a case of this character; and, *secondly*, by weighing and considering the testimony adduced on both sides, to determine whether the verdict is just and ought to stand. The authorities are not in entire harmony in their statements of the rule which should control the court in exercising the power of granting new trials in criminal cases. In Hil. New Trials, at page 114, it is said:

"A new trial may be granted in case of conviction upon insufficient evidence; but in criminal as well as civil cases a verdict will always have great weight with the court, and a new trial will not, of course, be granted, because the court is not satisfied beyond a reasonable doubt, from the evidence in the record, of the guilt of the defendants."

And authorities in support of this proposition are cited in the author's notes. In the same work, at page 480, cases are referred to in which it has been held that a new trial will be granted in criminal cases where circumstances of guilt are slight, or where the testimony preponderates against the verdict. So, where the court was satisfied that the facts were involved in too much doubt and uncertainty to warrant the conviction, or where the jury in a trial for murder had not, in the consideration of the evidence, given the prisoner the benefit of every doubt. Again, on page 448, it is said:

"Courts should rarely take it upon themselves to decide upon the effect of evidence. Were they so to act they might with truth be charged with usurping the privileges of the jury. If the verdict is clearly wrong, we must do so. If we only doubt its correctness, we must let it alone. \* \* \* A mere difference of opinion between the court and jury does not warrant the former in setting aside the finding of the latter. That would be, in effect, to abolish the institution of juries, and substituting the court to try questions of fact."

In *Waller* v. *State*, 4 Ark. 88, it was held that, in a criminal case, the presumption of law is in favor of the verdict; unless the record affirmatively overthrows this presumption, it will not be disturbed; and it must do this in such manner as to show that manifest injustice and wrong have been done in the premises.

In *Kirby* v. *State*, 3 Humph. 304, it was said:

"It is not to be understoood  *  *  *  that the verdict of the jury in a criminal case weighs nothing with this court, and that a new trial will be granted if, upon the evidence certified in the bill of exceptions, we are not convinced, beyond a reasonable doubt, of the guilt of the party. On the contrary, the jury are the exclusive judges of the credit of the witnesses, and in all cases much must occur before the court and jury, properly calculated to act upon their minds, which cannot be transferred to paper. A verdict, therefore, in all cases, must have great weight with this court."

In *People* v. *Goodrich*, 3 Parker, Crim. Cas. 518, it was held that the power to grant new trials ought not to be exercised, except in cases where it was the duty of the court to advise the jury to acquit the defendant, or to inform them that it was unsafe to convict upon the evidence before them; and that in cases of doubt, where the evidence is conflicting, and the credibility of the witnesses is in question, and no error has been committed by the court, a new trial will generally be denied. In this case a new trial was refused, although the court said that it would have been better satisfied with the action of the jury if they had acquitted the defendant.

Perhaps the correct rule on this subject is as well stated in the case of *State* v. *Elliott*, 15 Iowa, 72, as in any other. It was there held that while the court should set aside a verdict which is clearly against the evidence, and while greater latitude is allowed in the examination of motions for a new trial on this ground in criminal than in civil cases, it should be well satisfied of the insufficiency of the evidence to convince the judgment, reason, and conscience of the jurors of the correctness of the verdict. In the opinion of the court in this case it was said, as may be well said here, that in the consideration of the testimony much depended—

"Upon the character of the witnesses, their means of knowledge, their relation to the parties, their demeanor upon the stand, the agreement or non-agreement of their statements with the facts otherwise established, and many other matters not necessary to refer to in detail; and while a jury is not justified in arbitrarily disregarding the testimony of a witness, the circumstances which properly influence them are so various, and so often impossible to be known by this court, that, in case of conflict, there should be great hesitation before their conclusion should be disturbed.  *  *  *  It was the duty of the jury to be satisfied of the guilt of the accused, beyond all reasonable doubt, and this doubt is removed when they have arrived at that certainty 'which convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it,' (*Com.* v. *Webster*, 5 Cush. 320;) and while we recognize the duty of the court to interfere with an unjust verdict, it should, nevertheless, be well satisfied, when the testimony is conflicting, of its insufficiency to convince the judgment, reason, and conscience of the triers before setting aside the conclusion arrived at, as it must be presumed, after the requisite patient thought and attention."

The inquiry would seem to be, therefore, not alone whether the court, upon a consideration of all the evidence, might come to a different conclusion from that arrived at by the jury, but whether it is

clear, from the insufficiency of the evidence itself, that the jury have not rendered such a verdict as in reason and justice ought to have been rendered. In other words, the court should be able to say, this is such a verdict as cannot stand. Its injustice is manifest, because of the insufficiency of the evidence to sustain it. And where the credibility of witnesses is involved, so that it becomes necessary for the jury, in arriving at a conclusion, to determine who of the witnesses they will believe and who they will not believe,—who are corroborated and who are not,—and thus ascertain where lies the weight of credible evidence upon a given point, it is the duty of the court to exercise exceeding care lest it usurp the necessary functions of the jury, while at the same time it sees to it that an unjust conviction is not brought about with its sanction or concurrence.

Now, as the court stated to the jury, the oral proofs on the part of the prosecution consisted—*First*, of the testimony of persons who were members of the twenty-eighth regiment, the object of which was to establish the government's claim that the defendant was not, while in the line of his duty at St. Charles, in consequence of exposure to a snow-storm, attacked with a sickness which rendered him senseless, or which resulted in catalepsy, or any kindred disease; that he did not contract catalepsy while in the service, and was not treated in hospital, on the boat Imperial, or elsewhere, for any such disease. *Second*, of testimony relating to the performance of manual labor by the defendant, and his ability to perform such labor since he returned from the service. *Third*, of medical testimony concerning the disease known as catalepsy. *Fourth*, of testimony in support of the claim that certain relatives of the defendant, in the ancestral line, had what had been spoken of as fits and sinking spells, and that the defendant's alleged disorder was inherited. And, *fifth*, of testimony tending to show the circumstances under which certain of the affidavits set forth in the indictment were prepared and executed.

The evidence on the part of the defendant was addressed to, and was intended to meet the evidence of the prosecution upon these subjects of inquiry; the testimony on both sides embracing within its scope, numerous incidental points.

The testimony which the court and jury were required to consider was voluminous. Upon various points it was conflicting, as might well be expected in a case of this character. Listening to it attentively, as the court did when it was delivered; observing the witnesses as they testified, and the various points in their examination indicative of strength or weakness of recollection concerning the facts about which they testified,—when finally a conclusion was reached, and a survey could be taken of the whole case in its general features and in all its details, the mind of the court was impressed with the conviction that the stain of fraud rested upon the claim which the defendant had made and successfully prosecuted for the allowance of a pension. Subsequent reflection has not removed this belief. With-

out going into an analytical examination of the. evidence, it must suffice to say that the case was peculiarly one involving questions of the credibility of witnesses, and the accuracy of their recollection of facts and events; and it is impossible for the court to say that the jury exercised a perverted or mistaken judgment upon those questions. Of course, it cannot be said of the case made against the defendant that it is devoid of all doubt. Rarely can this be said of any case. At the same time it cannot be successfully maintained, I think, that the evidence is insufficient to sustain the verdict, or that the conclusions of the jury are not consistent with an honest, reasonable, and fair consideration of the evidence; and, applying to the case the rules of law which adjudications of undoubted authority declare should govern the court in determining the question here in judgment, I am of the opinion that the verdict should stand.