[Crim. No. 560.   Second Appellate District.—March 26, 1918.]

## THE PEOPLE, Respondent, v. G. A. WILSON, Appellant.

CRIMINAL LAW—SUBMISSION TO ARREST—SHOOTING BY OFFICER UNJUSTIFIED.—An officer is not justified in shooting a man in order to compel submission to an arrest on a misdemeanor charge.

ID.—RIGHT OF SELF-DEFENSE.—An officer properly engaged in attempting to make an arrest on a misdemeanor charge has the right to resist attack made upon him, and, being rightfully there and not legally considered the aggressor, may in his own defense take life.

ID.—MANSLAUGHTER — SHOOTING BY OFFICER WHILE ATTEMPTING TO MAKE ARREST—JUSTIFICATION—QUESTION FOR JURY.—In a prosecution of a deputy constable for manslaughter in attempting to make an arrest for a misdemeanor, the question whether the shooting amounted to a crime for which a conviction should be had was for the jury, and its verdict is conclusive on the appellate court.

ID.—ACTS OF DEFENDANT—PRESUMPTION AS TO INTENT—INSTRUCTION.—In a prosecution of a deputy constable for manslaughter for shooting a man he was attempting to arrest on a misdemeanor charge, an instruction that a person must be presumed to intend to do that which he voluntarily and willfully does in fact do, and must also be presumed to intend all the natural, probable, and usual consequences

of his own voluntary acts, and the willful use of a deadly weapon without excuse or provocation generally indicates a felonious intent, correctly states the law, but must be read in connection with the entire charge, and particularly the portion advising the jury that it must find beyond a reasonable doubt that defendant committed the acts charged.

ID.—BURDEN OF PROVING JUSTIFICATION—INSTRUCTION.—In a prosecution of a deputy constable for manslaughter for shooting a man he was attempting to arrest on a misdemeanor charge, an instruction advising that when a homicide is proved, the burden of proving circumstances of mitigation or that would justify or excuse it devolves upon a defendant, unless the proof on the part of the prosecution tends to show that the crime amounts only to manslaughter, or that the defendant is justifiable or excusable, was not erroneous, as assuming that the commission of the homicide by the defendant had been proved.

APPEAL from a judgment of the Superior Court of Santa Barbara County, and from an order denying a new trial. S. E. Crow, Judge.

The facts are stated in the opinion of the court.

W. T. Helms, and J. F. Frick, for Appellant.

U. S. Webb, Attorney-General, and Robert M. Clarke, Deputy Attorney-General, for Respondent.

JAMES, J.—Defendant was charged by an information of the district attorney of the county of Santa Barbara with having on the twenty-ninth day of April, 1917, murdered Pedro Lopez. The jury by its verdict found him guilty of the crime of manslaughter and the trial judge sentenced him to serve a term of ten years in the penitentiary. Motion for a new trial was made and denied and an appeal was then taken both from the judgment and from the order denying that motion.

The killing occurred while appellant, who was at the time a deputy constable, was assisting one Knight, the constable under whom appellant was deputized, in an attempt to arrest Lopez and a man named Flores. On the day in question Lopez, in company with Flores, one Pena, and one Cordero, was in a building which was located on the main street of the little town of Santa Ynez, in the county of Santa Barbara. Lopez at least had been drinking and by all of the testimony

was shown to have been considerably intoxicated. The men emerged from the building on to a vacant lot adjoining thereto. They were quarreling and fighting among themselves, one knocking the other down repeatedly. A fifth man named Espinosa made another of the party who participated in the fight on the lot. As to how the encounter started and as to who the chief aggressor was is, to our minds, immaterial to a consideration of the case. While the men were engaged in the mêlée, Wilson, who conducted a garage in the neighborhood, was notified of the disturbance by an employee of his, this employee being related to one of the participants in the disturbance. The announcement of this employee to Wilson at the time was for Wilson to "come, they are killing my cousin." Wilson had just previous to that time suffered an injury to one of his legs below the knee and the injured part was encased in a cast, making it necessary for him to use crutches or a crutch. Responding to the call made, Wilson got into an automobile and rode to the scene of the disturbance. There were a number of bystanders there at the time engaged in watching the fight and, as we may remark, seeming to enjoy the performance, as none of them offered to interfere to quell the disturbance. Wilson upon his arrival at the scene left his machine, called upon two bystanders to assist him, and attempted to arrest the men who were fighting. There was testimony of the prosecution introduced showing that he called upon the disturbers to cease their fighting and notified them that they were under arrest. That these men knew Wilson well and knew him to be an officer authorized to make arrests, the evidence admits of no doubt at all. Instead of submitting to arrest, the men turned upon Wilson, some one of them knocked his crutch or crutches away and knocked his gun from his hand. The testimony was undisputed as showing that Wilson made no attempt to use his revolver in any way other than in the attempt to intimidate the men and compel them to submit to arrest. The disturbers, however, appeared not to fear the gun and continued their aggressive acts against Wilson, who, recovering his gun from the ground, made his way back to the automobile and went after Knight, the constable. It is worth while here to note that had Wilson the inclination·or the desire to have shot any of the men during this first encounter, he had ample opportunity to do so, for he was

armed with a large caliber revolver which was fully loaded.
As soon as Wilson left the scene to get the assistance of
Knight, two of the participants in the row made their escape
or went away, and there remained Lopez, Flores, and Es-
pinosa. It is not clear that Espinosa participated actively
in interfering with Wilson's first attempt to arrest the dis-
turbers of the peace. Flores and Lopez, as the evidence indi-
cates, appreciated the fact that when Wilson obtained assist-
ance their arrest might be effected. As Wilson returned
with Knight, the three men last mentioned had started
across the field. Knight called upon them to stop. The tes-
timony of Flores and Espinosa was generally to the effect
that they obeyed the command, while Knight and Wilson
agree that the men did not. Whether they came to a stop
or not upon the call by Knight, it is clear beyond doubt from
the whole record that Flores and Lopez declined to submit
themselves to arrest. Knight stated that he fired several
shots into the ground in order to intimidate the men, and
there is no dispute about the fact that he did fire into the
ground. The testimony shows that Knight used his gun
only in the attempt to intimidate the men and compel them
to submit to arrest and as a club to beat off their attack upon
him. It was shown clearly that both Flores and Lopez de-
clined to acknowledge the right of Knight to arrest them and
that they proceeded with physical force to drive Knight away,
as they had previously done to Wilson. Knight grappled
with the men and the two appear to have gotten the better
of him. Meanwhile Wilson stood by, several feet away, tak-
ing no active part in the tussle. Up to this point we have
recited the facts which appear to be without material dis-
pute as the record shows them. From this point the testi-
mony in its narrative of the occurrence which culminated in
the shooting of Lopez is divergent. The testimony of sev-
eral witnesses introduced on behalf of the prosecution, some
of which is that given by bystanders, some by Flores and
Espinosa, was to the effect that in the midst of the struggle
between Knight and Flores and Lopez, Wilson approached
Lopez, and, standing a distance of from six to eight feet
away from him, deliberately discharged his revolver in
Lopez's direction, whereupon Lopez sank to the ground, shot
through the head. Lopez was in fact shot through the head
and died almost immediately. On the other hand, the tes-

timony first of Knight was that when the two men whom he was attempting to arrest began to get the better of him, he called out that unless someone came to his assistance he would have to shoot one of the men; that Wilson immediately came to his assistance, a shot was fired and Lopez sank to the ground, and that he (Knight) was then able to place handcuffs upon Flores. At about the same time, Knight testified, he (Knight) fired another shot from his revolver, aiming the shot downward between the legs of one of the men with whom he was struggling. Wilson testified that he did not intentionally fire any shot; that when he saw the men getting the better of Knight and Knight called for help, he approached and struck Flores, who appeared to be the more obstreperous of the two, over the head with his revolver, and that his revolver was discharged accidentally. As to where the shot went he testified that he did not know. We have here given a brief synopsis of the testimony covering the case as it was presented to the jury. There was some testimony in the record offered for the purpose of showing malice on the part of Wilson. This testimony consisted of statements of some of the witnesses that they had heard that Wilson had said at a prior time that there were some men whom he intended to "get," mentioning the name of Lopez as being one of them. There was testimony by another witness that after the shooting of Lopez, Wilson had stated that he had shot Lopez and made some further remark that he did not think any more of doing that than of hunting "rabbits." This testimony we must conclude was given no weight by the jury, for the verdict of manslaughter eliminated any finding of malice. No doubt that the jury considered, when it was made clear to it that Wilson upon the first encounter had every opportunity under provoking circumstances to use his weapon against Lopez, that there was small showing of any particular malice held in the mind of Wilson against any of the men concerned. From the undisputed evidence it appears very clear that Wilson, as an officer, was fully authorized to arrest Lopez and Flores and the other men engaged in the fight when he first appeared upon the scene where the disturbance was in progress. These men were then engaged in a public disturbance of the peace; they added to their offense that of resisting an officer in the discharge of a public duty. Not only was Wilson author-

ized to arrest them, but if he had declined to interfere, he would have left himself open to a charge of dereliction. The right to arrest the men did not cease when Wilson went away to get the assistance of Knight, any more than had the men fled, remained out of sight for a time, and then been overtaken by Wilson and whomsoever he might have secured to assist him in making the arrest. Knight's act in attempting to make the arrest was accompanied by all of the right which Wilson himself had. By reason of the particular verdict returned, we then view the case as being one which submitted to the jury the questions: (1) Whether under the circumstances of the case, the arrest being for a misdemeanor, there was no such exercise of force on behalf of the persons whose arrest was being attempted as to authorize the use of a deadly weapon to the extent of killing; (2) whether, conceding no intent to discharge the weapon and no necessity to so discharge it, the officer made use of it in such a careless and negligent manner as to make him responsible where a death resulted from his act. The first proposition, of course, involves the matter of self-defense. The law is well understood to be that an officer is not justified in shooting a man in order to compel submission to an arrest on a misdemeanor charge. While this is so, an officer properly engaged in attempting to make an arrest in such a case has the right to resist attack made upon him, and, being rightfully there and not legally considered the aggressor, may in his own defense take life. Under the testimony heard by the jury in the case, it does not appear *as a matter of law* that the act was justifiable. The facts under the conflicting testimony were for the jury to resolve. It was for the jury to say, judging from all the circumstances, as to whether the shooting of Lopez amounted to a crime for which a conviction of Wilson should be had. Upon those questions of fact and where the verdict is against the defendant, an appellate tribunal has no right to say that the determination of the jury should have been otherwise. Our examination can only extend to a consideration of the alleged errors which it is claimed were committed in the course of the trial by which defendant was prevented from having a full and fair hearing as guaranteed by the law.

Appellant contends, first, that he is entitled to a new trial because the jury received evidence out of court and the

members thereof were guilty of prejudicial misconduct. In support of this ground made on his motion for a new trial defendant made affidavits and by consent of the prosecution testimony was introduced orally on both sides. One Brant, at the trial, gave important evidence for the people. One of the jurors, Gordon, was the employer of the son-in-law of Brant at Santa Barbara. On several occasions during the trial Gordon was seen in company with Brant, riding in Gordon's automobile to the courthouse. Another juror, Gates, accompanied them on at least one occasion. On another occasion Gott and Fitzgerald, witnesses for the state, were with them. Appellant did not show that the persons mentioned had discussed at any of these times the case or any of the evidence. The attorney who represented the appellant at the trial testified that when a map or plat used to illustrate the scene of the shooting, and which had been introduced in evidence, was handed to the jury, the jury was instructed by the court not to discuss the map, and that, notwithstanding this injunction, jurors Gordon and Gates did point out the various places delineated on the drawing and discuss the same. It appears by the record that the jury, after having retired to the jury-room to deliberate upon a verdict and before agreeing thereto, was returned into court where the request was made that the jury be allowed to take certain exhibits, including this map. By consent of people and defendant, the exhibits were given to the jury, which again retired to the jury-room. It was while the jury was in the courtroom in the presence of the judge that it is claimed Gates and Gordon discussed the map. Gordon testified there was no such discussion had in the courtroom, and that while he had invited the three witnesses mentioned to ride with him to the courthouse, he had had no conversation with them about the case or the evidence; that he had merely picked them up on the street while all were on their way to attend the trial. Not only did appellant fail to furnish the trial judge with any proof that any improper communications had passed between the jury and witnesses, but positive testimony was furnished that no such communications passed. Conceding that it is always better that jurors should so conduct themselves as to avoid even the suspicion that they may have had discussion with witnesses about the case in which they are sitting, a suspicion alone may not be taken

as sufficient to establish the fact claimed. Had the showing made by the defendant, involving the association of Gordon with the witnesses Brant, Fitzgerald, and Gates, stood alone and uncontradicted, the trial judge would not have been authorized to conclude that there had been an interchange of improper communication. Referring to the question as to whether jurors Gates and Gordon, disregarding the injunction of the court, passed remarks between themselves upon the map exhibit while in the courtroom, it will be seen that the same condition of conflicting evidence was again presented to the trial judge. But we cannot perceive how, conceding that the jurors did do what is charged against them, prejudicial error would be created. The jury came into the courtroom and asked for the exhibits, including the map. Defendant consented that they have the map and it was taken to the jury-room for examination. The map had been regularly introduced in evidence and its contents were presumably well known to the jury.

Another ground of the motion for a new trial was that the court had misdirected the jury in matters of law and erred in its decision in the course of the trial. The discussion of the alleged errors in the giving of instructions should be prefaced by a summary of the charge as given by the court. The trial judge in this case gave very full instructions touching the right of peace officers to use deadly weapons in making arrests. He defined what constituted a disturbance of the peace and what constituted resisting an officer. While, as counsel for appellant suggest, the trial judge evidently thought that Knight and Wilson had not the right to attempt the arrest of Flores and Lopez at the time they did, this view of his was given expression only at the time of the sentencing of this appellant. The instructions did not so declare, either directly or by reasonable inference. And we deem it proper to say, at the end of an exhaustive perusal of the record, that we find nothing to indicate on the part of the trial judge the hostile, prejudiced attitude ascribed to him in the briefs of counsel. We find but one instruction offered by defendant and marked in the record as "refused." That instruction defined the crime of manslaughter and its substance was contained in the charge read by the court to the jury. Instruction No. 4 is attacked on the ground that the assumption was presented to the jury

that there was an absence of evidence showing that appellant did not intend the death of Lopez. This instruction was in the following words: "A person must be presumed to intend to do that which he voluntarily and willfully does in fact do, and must also be presumed to intend all the natural, probable, and usual consequences of his own voluntary acts. Therefore, where one person assaults another violently with a dangerous weapon, likely to kill, and which does in fact destroy the life of the party assailed, the natural presumption is that such assailant intended death, or other great bodily harm, and in the absence of evidence to the contrary, this presumption must prevail. The willful use of a deadly weapon without excuse or provocation generally indicates a felonious intent." The instruction correctly stated the law and is one so frequently given as to have become almost axiomatic. It must not be read alone, but must be read in connection with the entire charge, and particularly that portion of it which advised the jury that it must find beyond a reasonable doubt that defendant committed the acts charged. It was qualified, too, by instructions defining the right of peace officers to resort to the use of deadly weapons in making arrests or in defending themselves against attack while so engaged. Instruction No. 29, it is contended, was inappropriate and erroneous under the defense made to the charge. By this instruction the jury was advised that when a homicide is proved, the burden of proving circumstances of mitigation or that would justify or excuse it devolves upon a defendant, unless the proof on the part of the prosecution tends to show that the crime amounts only to manslaughter, or that the defendant is justifiable or excusable. Of this instruction counsel say: (1) "It is a practical assumption by the court that the commission of the homicide by the defendant has been proved"; (2) "Otherwise the instruction could have no application to the case and, by the words of the instruction itself, it should not have been given, since the very last clause of the instruction itself provides that it is not to be applied when the proof on the part of the prosecution tends to show that the defendant was justifiable or excusable." Read in connection with other instructions given, there was no assumption of guilt reasonably to be deduced from this instruction. In making the second point against it, counsel has tried the case for the jury and ren-

dered his verdict. The charge made in the information was murder, and the jury had the right to determine under the evidence whether defendant was guilty at all, or, if guilty, whether his guilt was of the first or second degree, or was manslaughter. Instruction No. 31, which is criticised by appellant, appears to have been given at the request of the defendant, and, therefore, appellant cannot be here heard to question its soundness.

It is argued that the testimony of two witnesses to the effect that about a month before the shooting of Lopez they had heard Wilson say that he was going to "get" Lopez, Flores, and another man named, and that he had a big gun that would stop them, referred to statements and incidents too remote to be competent. This testimony was not remote in point of time, and was introduced in support of the attempt on the part of the prosecution to show malice of Wilson. As has already been noted, the jury evidently did not pay great heed to this testimony, for the offense of which they convicted the appellant involved no particular malicious intent. But there is another and complete answer to any objection that might have been here made to this evidence, and that is that it appears that no objection at all was urged at the trial against its introduction. The same condition of the record is shown and the same answers may be made to the contention for error in admitting the testimony of Ed Hames. Hames testified regarding some "trouble" that appellant had had a year before with Lopez over cattle, and to having heard appellant at that time say that he would kill Lopez. It would serve only to extend this opinion to an unwarrantable length to take up with more detail the objections urged against the admissibility of other testimony, or to alleged misconduct of the prosecuting officers. The testimony of which complaint is pointedly made was received without a word of objection from the defendant at the trial. Statements of the prosecuting attorneys, which it is claimed were calculated and intended to improperly influence the jury, were not objected to at the time and no request was made to have the court instruct the jury to disregard them. The prosecuting officers were indeed zealous in their endeavors to convict the defendant. The introduction of an American flag found about the neck of Lopez and the narrative of how it had been the subject of a quarrel on the day

of the shooting, when Lopez was said to have declared his willingness to fight for the flag, were no doubt "make weights," for we can see no reason why the flag or the incident referred to tended to establish that Wilson shot Lopez either lawfully or unlawfully. Evidently the prosecutors, from the manner of their examination of witnesses, took the view, which they sought to impress upon the jury, that Wilson and Knight had not the right to attempt the arrest of Lopez and Flores. We must assume that the instructions of the court were heeded by the jury, and, as before noted, these instructions were comprehensive in defining the rights of officers as our law declares them to be.

It is claimed that the court erred in sustaining objection to a question asked of the witness Bailey, who was called for the defense. Flores, a fellow-participant with Lopez in the disturbance occurring on the day Lopez met his death, while testifying for the people, was asked on cross-examination whether Lopez had a gun at the time he was shot. Flores replied in the negative, and was next asked whether he had not, after the shooting, told Bailey that there was a gun found at the scene of the affray and that it was Lopez's. He replied that he had not so stated. Bailey was interrogated as to the alleged statements of Flores. The record shows the examination of Bailey on this subject to have been as follows: "Q. Did you in the presence of Frank Flores and his mother on the Indian Reservation, near Santa Ynez, on the night of the 30th of April, 1917, have any conversation with Frank Flores about a gun? A. I asked Mr. Flores if the gun that Robles picked up over there near where the fight occurred was his gun. He stated that it was not. I said, 'Do you know whose gun it is?' Mr. Ford [the assistant prosecutor] : Just a moment. We object to that as hearsay. The Court: That objection is sustained." The objection, we think, was properly sustained on the ground stated by the prosecuting officer.

It is claimed that the evidence showed without conflict that it was a bullet from Knight's gun, and not from Wilson's gun, that killed Lopez. Knight was using a .32-caliber gun, while Wilson's gun was a heavy .45-caliber weapon. The testimony of the physician who examined the wound in Lopez's head was that the aperture at the place of exit was much larger than the aperture at the point of entrance.

There was testimony that the bullets used in Knight's gun were soft and that the bullets used in Wilson's gun were hard, "steel-jacketed." The defense produced a witness who qualified as an expert and who had had experience in army hospitals, and had also made certain 'tests before the trial with guns and bullets of the kinds used by Wilson and Knight. The testimony of this witness was to the effect that a .45-caliber bullet such as was used in Wilson's gun would produce approximately the same size of hole at the point of exit as to the point of entrance, and that the kind of bullet used in Knight's gun would 'produce a smaller hole at the point of entrance than at the point of exit, owing to the fact that the bullet was softer and would spread out as it encountered the bone on the opposite side of a head. This evidence was not conclusive of the fact that 'a bullet from Knight's gun, and not from Wilson's, had passed through the head of Lopez, and it was still left for the jury to determine under 'all of the facts laid before them as to whether the deadly wound had been inflicted by appellant.

The law as stated by appellant's counsel touching the right of peace officers to use deadly weapons in effecting arrests is no doubt correctly set forth in the briefs. In the opening paragraph of this opinion we have expressed a view which accords with that which is given exposition in the authorities cited by appellant. The difficulty with appellant's position is that he leaves out of account the consideration that there was some substantial evidence given which showed that Wilson acted deliberately and without such provocation as the law deems sufficient to justify an officer in killing a person whose arrest on a charge of misdemeanor he is attempting to accomplish. It may be that that testimony was untrue; it may be that the shooting was an accident which occurred while Wilson in good faith was using only such force as the circumstances reasonably justified in assisting his fellow-officer in the lawful undertaking of arresting a disturber of the peace. But we are not permitted to substitute our judgment for that of the jury, or to say on the facts that the verdict should have been otherwise. It may be well said that any error of a fairly substantial nature might be sufficient to justify a reversal of the case. This because of the fact that a verdict in favor of the defendant could not have been assailed on the ground

that it was not fully supported by competent evidence. In other words, any substantial error would make it appear more readily that there had been a miscarriage of justice. However, we have searched with great diligence through the record and have examined with much care all of the assignments of error made by counsel in their brief. We find nothing which would justify the conclusion that defendant was not given a fair trial, or that he was denied any right which the law guarantees to a person accused of crime.

The judgment and order appealed from are affirmed.

Conrey, P. J., and Works, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 25, 1918.