456 So.2d 395 (1983)
Varnall WEEKS
v.
STATE of Alabama.
5 Div. 726.
Court of Criminal Appeals of Alabama.
November 29, 1983.
Rehearing Denied January 10, 1984.
*396 Jock M. Smith, Tuskegee, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
TYSON, Judge.
Varnall Weeks was indicted for the intentional killing of one Mark Batts, during the course of a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The jury found him "guilty as charged" in the indictment. The appellant waived the participation of the jury in the sentence determination and demanded the trial judge sentence him to death. The trial judge held a sentencing hearing at which he found two aggravating circumstances and no mitigating circumstances. See Appendix A, hereto attached and made a part hereof.
The trial judge determined the aggravating circumstances clearly outweighed the mitigating circumstances and sentenced the appellant to death.
The first witness for the State was Tommy Batts of Murfreesboro, Tennessee, the father of the deceased. He testified he had given his son a blue, two door, 1981 Honda automobile which bore the Tennessee license plate, 11XP67.
Christine Jenkins, a veterinary medicine student at Tuskegee Institute, testified the deceased was her boyfriend and she lived with him at 301 Neal Street in Tuskegee, Alabama.
On October 1, 1981, Jenkins left the house at 8:10 a.m. to attend class. The deceased was still at the house and was wearing his gold chain necklace, Seiko watch and Bata tennis shoes. His blue Honda was parked in front of the house. On this day, the deceased had an important class to attend from 8:00 a.m. until 4:30 p.m. It was a mandatory class at which he was to prepare his animals for surgery the next day. At 4:30 that afternoon, Jenkins learned that the victim had not shown up for class and she called the police at 9:00 p.m. to find out how to report a missing person.
The next morning, October 2, 1981, Jenkins went to the Tuskegee Police Station to place a "missing person report" on Mark Batts.
Celia Davis stated she lives at 600 North Gay Street in Tuskegee. On the morning of October 1, 1981, as she and her husband were leaving for work, she saw the appellant walking down Gay Street toward Neal Street. The house where the deceased lived was across the street from her house but faced Neal rather than Gay Street. She also noticed the deceased's car parked in front of his house.
Mrs. Davis' husband, Major Cecil Davis, testified that he also observed the appellant that morning at the corner of Gay and Neal Streets. Davis noticed the appellant because *397 he had never seen him before in the neighborhood.
John R. Meadows, the Assistant Police Chief for the City of Tuskegee, took the missing person report from Ms. Jenkins on October 2, 1981. She described the deceased and his car to him.
On October 5, 1981, Don Williams, a criminal investigator with the Alabama Bureau of Investigation (ABI), went to Tuskegee to assist in a missing person investigation. The next day, he received information from the East Cleveland, Ohio Police Department, relating to an automobile which had been recovered.
On October 7, 1981, he went to East Cleveland. There, he saw appellant and talked to a Jewel Martin from Tuskegee. She gave him a deposit slip bearing the name of Mark Batts and vehicle identification papers belonging to Tommy Batts.
Williams also observed a blue Honda automobile at the police station. A Tennessee license plate, 11XP67, was recovered from the dashboard of that car. Detective Hughey of the East Cleveland Police Department gave Williams a .38 revolver which he turned over to Lonnie Harden.
On October 6, 1981, David Deardon, a police officer with the East Cleveland Police Department, noticed a blue Honda Civic make an illegal left turn. When he stopped the automobile, he noticed the driver, whom he identified as the appellant, was wearing a brown leather type jacket and the passenger was a black female. Deardon also observed a Tennessee license plate in the window.
When Deardon asked the appellant for his driver's license, he gave him a license bearing the name of Mark Batts. Deardon then asked the appellant to get out of the car, which he did. As Deardon was making a pat down search of the appellant, the appellant pulled out a chrome-plated gun and shot Deardon in the chest.
As Larry Lester of the East Cleveland Police Department approached the scene of the routine traffic stop, he saw the appellant shoot Deardon and then point the gun at Deardon as if he were going to shoot again. Lester then shot at the appellant who fled into a nearby neighborhood.
As he and other officers searched the area, the appellant came out of a house and was placed under arrest. A .38 silver revolver and a brown imitation leather jacket were found under a porch approximately ten yards from where the appellant was apprehended. The jacket bore the name of the appellant's brother, Chenoy Weeks.
Lieutenant Richard Stinson gave the .38 gun to the Cleveland Police Department Scientific Investigation Unit so that it could be processed for fingerprints. Later, the gun was given to Don Williams.
Lieutenant James Hughey of the East Cleveland Police Department processed the blue Honda for fingerprints and gave the appellant's fingerprint card to Edward Walsh of the fingerprint section of the Cleveland Police Department Scientific Investigation Unit.
Walsh testified he lifted the appellant's right thumb print off of a bullet found inside the .38 gun found under the porch.
Detective James Copeland of the East Cleveland Police Department, received a driver's license belonging to Mark Batts from the ambulance driver at the scene where Deardon was shot. He also learned that the blue Honda belonged to Tommy Batts of Murfreesboro, Tennessee.
At this time, a hearing was held outside the presence of the jury to determine the voluntariness of the appellant's statement. Copeland stated the appellant was advised of his Miranda rights and stated that he understood those rights and wished to make a statement. He refused to sign the transcribed statement. No threats, inducements, coercion or hope of reward were offered or used to obtain the statement.
The appellant stated that he was never advised of his rights and signed the waiver believing it to be a property slip. He denied making a statement. The appellant stated he requested a lawyer and the police continued asking questions after he made the request.
*398 The trial judge ruled the appellant's statement was voluntarily made and allowed its admission into evidence. The statement reads as follows:
"After advising Varnell Weeks of his rights he was interviewed. He stated that he left Tuskegee, Alabama some time Thursday, October 1st, near noon. Later that afternoon the bus stopped in Atlanta, Georgia, a Greyhound bus. At one point he stated that he spent the night in Atlanta and left the next day. He later changed that story to he got off the bus as he gased up and went to the men's room. The bus pulled out a short time later, and he was on the bus. He doesn't remember any of the other towns the bus made stops in. But it took approximately five days for the trip. He stated that he made the trip alone. When he left Tuskegee, Alabama he took only the clothes he was arrested in, a pair of blue jeans, a short-sleeved white and yellow shirt, and a pair of tennis shoes. He also stated that the large amount of money that he had on his person was obtained from his relatives and friends but he could not give any names. He decided to come to Cleveland, Ohio to buy clothes. He then changed that story to he came to Cleveland for a job to buy clothes and to relocate. He stated that when he got in Cleveland he met a male at the bus station and that male, name unknown, drove him around Cleveland. While they were riding around Cleveland he and the male smoked marijuana, and he got very high. He stated that he got hungry, and when they saw McDonald's he was let out of the car, and the unknown male continued on. He described the vehicle he was in as a small blue car, make and plate number unknown. As he approached McDonald's a black male grabbed him and he fought with same breaking away and then running. He doesn't know why the male grabbed him, but he washe suspected the male wanted to rob him. A short distance away he saw the police and he was arrested. Weeks could give no description of any building or business in the area of the McDonald's Restaurant and doesn't know if he was in the front or at the rear of McDonald's. When asked if he smoked while in the car he said no. He said that he does smoke and his brand is Kools. He further stated that he did eat while in the car. It was also noticed that there was an impression of a hat being around his head and hair. And he was asked if he wore a hat. And he stated that he had a hat, but he didn't know where it was at. He stated that he knew nothing about the shooting of a police officer and became very nervous when questioned in that area. He denied wearing the leather jacket found by police and also ever seeing the blue and white shower slippers. He stated that he injured his foot fighting with the unknown male that grabbed him near or in front of McDonald's. He stated that he had on tennis shoes at the time during the struggle and both shoes came off and he left them behind. When asked about lack of clothes and other personal items needed when relocating he stated that he travels light. When asked where he got the money he stated that he would meet females while enroute from Alabama and they would give him money. Again, names and addresses not known. During the interview Weeks stated that the jacket found by police with the name of Chevoy Weeks stamped on the lining was his brother's. He didn't know how it got here. And the black notebook with the photos in same was identified by Weeks. He stated that the photos were of him and his relatives. A card in the notebook from Reader's Digest addressed to Chevoy Weeks was that of his brother's." (R. 198-200).
J.H. Abbett, an investigator with the ABI, coordinated the search for the body of Mark Batts on October 7, 1981. A search was conducted near the appellant's home on Ashdale Road in Tuskegee.
At approximately 1:20 p.m., one of the members of the search party found two notebooks, one green and one black, which *399 contained materials relating to veterinary medicine, in a wooded area behind the appellant's house.
Both notebooks were turned over to Marietta Prevost, a latent fingerprint examiner with the ABI.
A short time later that afternoon, in the same area, another member of the search party noticed an area of gray dirt which had been recently overturned. Abbett used a shovel to remove some dirt and uncovered the deceased's body. The body was covered by a green blanket. Two pillowcases had been placed over the head and the feet were tied together with a rope. The deceased was wearing a gold necklace, a Seiko watch and Bata tennis shoes. The area where the body was found was approximately 100 feet from the appellant's house. The body was turned over to Dr. Thomas Gilchrist, a pathologist for the Department of Forensic Sciences (DFS).
Gilchrist determined the body to be that of Mark Batts after examining the dental charts of Mark Batts, provided by the deceased's dentist, Dr. Jerry Compton. Next, Gilchrist conducted an autopsy on the body. An external examination of the body revealed ligature marks on the legs where they had been tied with a rope and a bullet wound behind the right ear. The soot deposition around the wound indicated the gun was extremely close to the head when it was fired. Gilchrist removed the bullet from the head and gave it to Lonnie Harden.
Marietta Prevost processed the two notebooks which were found for fingerprints. Along with the fingerprints of the deceased, she found two of the appellant's fingerprints on the notebooks and the fingerprints of Chenoy Weeks.
Lonnie Harden, a Firearm and Toolmarks coordinator for the DFS examined the .38 revolver given to him by Don Williams and a bullet taken from the head of the deceased Batts. He determined the bullet had been fired from that particular gun.
On October 1, 1981, Jewel Martin saw the appellant at the Chicken Coup in Tuskegee. She and a girlfriend then went to the appellant's house on Ashdale Road where they drank beer and smoked marijuana with the appellant and Chenoy Weeks.
On October 3, 1981, at approximately 11:00, the appellant picked up Martin in a little blue Honda from the Astrology Club. The two drove to Montgomery and the appellant left her there overnight. The appellant came back the next morning and they drove to Cleveland.
On the way to Cleveland, Martin found the deceased's driver's license in the glove compartment. When she asked about the license, the appellant stated he had killed a Tuskegee Institute student and buried him in his backyard. The appellant told her if she told anyone he would kill her.
Martin further testified that the police and the District Attorney's office agreed to drop all charges pending against her if she would testify at the appellant's trial.

I
The appellant's first contention is that the trial court erred in admitting evidence which showed the appellant had committed another "unrelated crime" in East Cleveland, Ohio. The appellant objects to the testimony concerning the appellant's shooting Officer Deardon, his subsequent arrest and the statement which he gave to the police in East Cleveland.
"While it is true that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which an accused is being tried, if the accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes is admissible. Sparks v. State, 376 So.2d 834 (Ala.Cr.App.1979); C. Gamble, McElroy's Alabama Evidence § 69.01(1) (3rd ed. 1977)."
Watson v. State, 398 So.2d 320 (Ala.Cr. App.1980); Cheatham v. State, 431 So.2d 1350 (Ala.Cr.App.), cert. denied, 431 So.2d 1350 (Ala.1983).
*400 Therefore, evidence of other distinct crimes committed by an accused is not admissible as substantive evidence to prove the accused's guilt of the particular offense for which he is on trial. Allen v. State, 380 So.2d 313 (Ala.Cr.App.1979), cert. denied 380 So.2d 341 (Ala.1980), cert. denied 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); Wilkins v. State, 29 Ala.App. 349, 197 So. 75 (1940). However, if evidence of other collateral crimes which were committed by an accused tends to point to the guilt of the accused as to the offense upon which he is being tried, then the "... evidence is relevant and competent [and] it should be admitted regardless of its incidental effect." Allen, supra; Wilkins, supra.

"All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If the evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime or may establish some collateral and unrelated fact."

Allen, supra; Cheatham, supra.
The evidence adduced at trial showed the appellant was stopped in the deceased's automobile by Officer Deardon for a minor traffic offense and he presented the deceased's driver's license to Deardon. A short time later, the appellant shot Deardon, fled the scene and was apprehended shortly thereafter. The gun that was used to shoot Officer Deardon and that which killed the deceased, Batts, and a jacket belonging to the appellant's brother, were found a short distance from where the appellant was apprehended in East Cleveland, Ohio.
The evidence about which the appellant complains was absolutely essential to establish the appellant's possession of the murder weapon. Furthermore, the evidence tended to connect the appellant with the deceased in that the appellant was in possession of the deceased's automobile, and his driver's license when he was stopped by Officer Deardon.
This court has stated that evidence of other crimes is admissible in court "when it is necessary to prove the identity of the the offender, or of an instrument used in committing the offense." Allen v. State, supra.
The evidence admitted at trial concerning the incident in East Cleveland was clearly relevant to prove the identity of the appellant as the person who killed the deceased, Batts, and the identity of the weapon used in this murder.
Furthermore, the fact that the appellant, after being stopped for a minor traffic offense and being found in the possession of the deceased's automobile and driver's license, shot Officer Deardon and then fled, indicates a consciousness of guilt and thus, was also relevant for this reason.
The admission of the appellant's statement which was made to the police in Cleveland was relevant for the purpose of establishing the fact that the jacket which was found with the murder weapon was his brother's. The appellant certainly cannot object to the admission of his statement here at issue because it did not prejudice him in any way. He did not say anything about the murder in Tuskegee and he denied involvement in the shooting of Officer Deardon and even claimed he had no knowledge of how his brother's jacket came to be found approximately ten yards from where he was apprehended.
The evidence about which the appellant complains was relevant to prove the murder weapon had been in the possession of the appellant and that the appellant had possession of the deceased's automobile and driver's license. This evidence circumstantially *401 links this appellant to the murder at issue and was certainly admissible for that purpose.
We must also commend the trial judge in this case for his diligent efforts in instructing the jury that the evidence of the crime in Ohio was not relevant for any purpose except to connect him to the crime here at issue. (See R. 141, 142, 147).
Merely because the evidence of the crime in Ohio, which was admitted during trial, showed the appellant had committed another crime does not justify its exclusion. The trial judge weighed the probative value of the evidence and determined its admission clearly outweighed any incidental prejudicial effects on the appellant.
Therefore, this evidence was properly admitted.

II
The appellant contends reversible error occurred because the trial judge failed to grant a mistrial after learning that one of the State's witnesses, Jewel Martin, rode in the automobile to the courthouse with two jurors.
While no one should contend that this course of conduct was proper, we do not find it to be here erroneous. The United States Supreme Court in Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), stated that:
"Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."
"These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."
As Judge Bowen stated in Bascom v. State, 344 So.2d 218 (Ala.Cr.App.1977), the facts and circumstances of each case must be examined on an individual basis to determine whether an accused's rights have been prejudiced when a situation occurs where a juror's impartiality might be in question.
The trial judge in this case questioned the bailiff who rode in the car with the witness, and also the two jurors, to determine if any discussion of the case had occurred. Each denied that any conversation had taken place. Further, he asked each of the jurors if this incident had affected their ability to decide this case impartially and solely based on the evidence which they heard at trial. Both jurors stated that it did not. The trial judge correctly decided that the appellant had not been prejudiced in any way by this incident even though he did admit it was improper.[1] We find no abuse of the trial judge's discretion in overruling the appellant's motion for a mistrial, based on this incident.

III
The appellant alleges that the State maintained custody of Jewel Martin on the night before she testified to insure that her testimony was favorable to the State. We find no merit to this contention.
The record clearly shows that the State believed they had to maintain custody of *402 Martin to insure her appearance for trial. We have no knowledge of the reasons the State believed Martin would not appear for trial but in the absence of evidence to the contrary, we must believe that such existed. We find no error on this ground.

IV
The appellant's contention that he should have been granted a new trial because Jewel Martin was coerced into testifying against the appellant is totally without merit.
At the hearing on the appellant's motion for a new trial, Martin stated that some of the things which she testified to at trial she was forced to say. She said that the police and the district attorney told her if she did not testify she was going to jail. When asked about which parts of her testimony were untrue, Martin stated she didn't remember.
The trial judge held that her testimony was not credible and overruled the appellant's motion for new trial. Since the trial judge was present during trial and also at the hearing and listened to Martin's testimony and observed her demeanor, we feel he was in the best position to determine which portions of Martin's testimony were to be believed.
We find no abuse of the trial judge's discretion in his overruling the appellant's motion for a new trial.

V
The appellant cites two cases, Cox v. State, 50 Ala.App. 339, 279 So.2d 143 (1973) and Alberson v. State, 254 Ala. 87, 47 So.2d 182 (1950) for the proposition that appellate courts must exercise a higher standard of review in death cases than in non-capital cases.
This court certainly agrees with this point as made by this appellant. The scope of review in death cases is clearly set out in Rule 45A, Rules of Appellate Procedure. It states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Therefore, in death cases, we must search the record for any errors which occurred during trial, that may have gone unnoticed and determine whether such, if any, of these errors were injurious to the appellant. We have examined the record in this case and we do not find any errors that have adversely affected the substantial rights of this appellant.

VI
As required by § 13A-5-53(a), Code of Alabama 1975, we have independently reviewed the sentence of death imposed on this appellant to determine whether it was the proper sentence under the particular circumstances of this case.
We do not find any evidence that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. In view of the fact that this court has also found two aggravating circumstances and no mitigating circumstances in this case, such aggravating circumstances clearly here outweigh any mitigating circumstances. The sentence of death has been imposed in many cases in which the circumstances are similar to the facts in this case. See Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), cert. denied, 431 So.2d 563 (Ala.1983); Baldwin v. State, 456 So.2d 117 (Ala.Cr.App.1983) and cases cited therein; Luke v. State, 444 So.2d 393 (Ala. Cr.App.1983), affirmed, 444 So.2d 400 (Ala. 1983).
After our review of the record, this court finds the sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
*403 BOWEN, P.J., and HARRIS and SAM TAYLOR, JJ., concur.
HUBERT TAYLOR, J., dissents with opinion.
 APPENDIX A
STATE OF ALABAMA IN THE CIRCUIT COURT OF
 PLAINTIFF, MACON COUNTY, ALABAMA
 AT TUSKEGEE
VS CRIMINAL ACTION CC 82-42
VARNELL WEEKS
 DEFENDANT.

SUMMARY OF CRIME

and

ORDER ON SENTENCE HEARING
Varnell Weeks, 27 years of age, abducted Mark Anthony Batts, a Tuskegee Institute student, robbed him of his car, a 1981 Honda automobile, tied his feet and hands together, placed a pillowcase over his head, shot and killed Batts at close range through the pillowcase with a pistol. The victim was then buried in a shallow grave near the home of Weeks.
Weeks took the car and gun and fled to Ohio with a woman known as Jewell Martin. Miss Martin found Batt's driver's license in the car and questioned Weeks about it. Weeks told her he had killed a Tuskegee Institute student to get his car.
During the flight in the car of Batt's, Weeks was stopped by the East Cleveland, Ohio, police and asked for his driver's license. Weeks gave him the license of Batts and while the officer was patting Weeks down, Weeks drew the gun which he had used to kill Batts and shot the policeman. Weeks was apprehended by the East Cleveland police and subsequently returned by the Ohio authorities for trial in Alabama.
Defendant was tried by a jury and convicted of capital murder during a robbery in the first degree on June 22, 1982.
Judgment of Conviction was pronounced by the Court. Sentence hearing was set for 9 a.m. on June 23, 1982, before the jury which had convicted Weeks.
On the 23rd day of June, 1982, the Court was informed by the attorney for the defendant that the defendant desired to waive the participation of the jury in the sentence hearing.
In open Court in the presence of his attorney, the defendant was expressly advised by the Court that he had the right to have the jury participate in the sentence hearing and advise the Court on the sentence. The defendant himself indicated to the Court that he did not want the jury to participate and he would waive participation of the jury. Further interrogation of the defendant by the Court convinced the Court that the defendant was freely waiving the right of jury participation. He indicated that the jury had done its duty and he would leave the sentence in the hands of the judge but would prefer death. The waiver of jury participation was approved by the State, the attorney for the defendant and by the Court as required by law.
Evidence was heard by the Court and the Court finds from the evidence presented at the trial and sentence hearing aggravating circumstances beyond a reasonable doubt as follows:
1. The capital offense was committed by the defendant while the defendant was engaged in the commission of a robbery in the first degree or flight after committing the robbery. The jury found the defendant guilty of the offense and the jury was justified in such finding.
2. The capital offense was especially heinous, atrocious or cruel compared to other crimes. The victim was tied by his feet, a pillowcase placed over his head. He was shot at close range through the pillowcase, killed and buried in a shallow grave all in gangland style.
The young victim must have suffered much physical pain with his feet tied so securely as to cause marks on his legs.
The emotional pain must have been great with the pillowcase over his head and tied up while worrying about what was going to happen to him and who would feed his animals at school.
*404 The Court finds no mitigating circumstances and the defendant presents none and agrees there are none.
The aggravating circumstances clearly outweigh the mitigating circumstances and the Court is of the opinion that the death sentence should be and will be imposed. Such determination is made without consideration of the defendant's request that the death sentence be imposed.
Ordered this 23 June, 1982.
 s/William I. Byrd
 Circuit Judge
HUBERT TAYLOR, Judge, dissenting.
The very appearance of two jurors riding in the same automobile with the prosecuting witness is sufficient to cause inherent prejudice. This case falls within that minority of cases in which the accused should not be required to prove prejudice; the appearance of the thing itself initiates prejudice per se.
We do not know what really was discussed during the ride from the motel to the courtroom. We do know, however, two jurors who were part of deciding the ultimate fate of the accused were in personal contact with the one whose testimony sealed that fate. This conduct is not only offensive but erodes the entire process of law.
NOTES
[1] We must note the State has pointed out to us several cases in which the identical situation as we found in this case occurred in other states and those courts have held reversible error did not occur when the trial judge makes a finding that the appellant's rights were not prejudiced. See People v. Wilson, 36 Cal.App. 589, 172 P. 1116 (1918); People v. Murphy, 412 Ill. 458, 107 N.E.2d 748 (1952); U.S. v. Daubner, 17 F. 793 (E.D.Wis.1883); Perry v. State, 38 Okl.Cr. 202, 259 P. 657 (1927).